```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
DEODHARRY TILLACKDHARRY,                          :
                                                  :
                        Plaintiff,                :   05 Civ. 6639 (HB)
                                                  :
            - v-                                  :   OPINION & ORDER
                                                  :
JO ANNE BARNHART,                                 :
COMMISSIONER OF SOCIAL SECURITY,                  :
                                                  :
                        Defendant.                :
------------------------------------------------------------------------X
```

**Hon. HAROLD BAER, JR., District Judge:**

Deodharry Tillackdharry, pro se, brings this action pursuant to 42 U.S.C. Section 405(g), to challenge the final determination by the Commissioner of Social Security ("Commissioner") that he was not "disabled" within the meaning of the Social Security Act from December 3, 2001, through March 31, 2002, and hence not eligible for disability insurance benefits ("DIB"). The Commissioner moves and Tillackdharry cross-moves for judgment on the pleadings. For the following reasons, the Commissioner's motion is granted and Tillackdharry's motion is denied.

## I. BACKGROUND

**A.      Plaintiff's Background**

Tillackdharry, who is of East Indian descent, was born in Guyana in 1951. Transcript of Administrative Record of Social Security Administration ("Tr.") at 301-02. He completed high school in Guyana and came to the United States in 1969 to pursue a college education. Tr. at 281, 302. After he obtained 49 credits in Animal and Agriculture Science at Sul Ross State University in Alpine, Texas, he had to drop out of college because of financial hardship. Tr. at 254, 281.

In or about 1973, Tillackdharry moved to New York and found work as an Assistant Warehouse Manager, a position he held for about twelve years. Tr. at 254. Subsequently, he worked as a cargo agent at JFK International Airport for a year, a processing clerk at a bank in New York for about four years, and a stock clerk in retail stores in New York for about a year. Id. For part of 1999 and 2000, he worked intermittently doing clean up—sweeping and

removing trash—at construction sites in Florida. Tr. at 307-08. He last worked as a warehouse stock clerk for a supermarket chain in Florida for about seven months until October 2, 2001. Tr. at 254, 303.

Tillackdharry became a citizen of the United States in 1978. Tr. at 281. He was married for seventeen years but his wife divorced him in 1995. Id. He has a twenty-four year old daughter with whom he maintains little contact. Tr. at 102, 281. In 1999, Tillackdharry lost his apartment after he was arrested for grand larceny.[1] Tr. at 281. He then lived with his daughter and with a friend, and was also homeless for some time. Tr. at 313-14. He entered the Bellevue Continuing Treatment Program for the mentally disabled and homeless in 2003, and moved to a room provided by PCMH,[2] an outpatient housing program, in 2004. Tr. at 281; Pl.'s Mem. of Law in Supp. of J. on the Pleadings at 4. Presently, Tillackdharry lives in an apartment in the Bronx. 10/11/2005 Pl.'s Change of Address Mem.

**B.** **Evidence from Medical Reports**

    **1.** **Physical Health**

Around the period relevant to Tillackdharry's DIB claim, the record contains reports of seven visits to Jacobi Medical Center ("Jacobi") from October 18, 2001, to April 17, 2002. On the first visit, Tillackdharry sought to refill his hypertension medications and complained of neck and shoulder pain. Tr. at 116. The nurse practitioner prescribed medication for hypertension, low back pain, and depression, and advised Tillackdharry to seek treatment for his depression at Bronx Lebanon Hospital. Tr. at 117-18.

Two weeks later, the examining physician noted that Tillackdharry's depression and hypertension had improved. Tr. at 123-24. An electrocardiogram revealed bradycardia—slowness of the heartbeat—and Tillackdharry was directed to return in six weeks. Tr. at 119, 123-24; Dorland's Illustrated Medical Dictionary ("Dorland's") 237 (29th ed. 2000).

At the third visit, the attending physician observed that Tillackdharry's hypertension was "inadequately controlled" and prescribed medication. Tr. at 128. His blood pressure readings of 150/94 and 144/96 indicated mild hypertension.[3] Tr. at 127.

---

[1] The charge was dropped to disorderly conduct in 2004. Tr. at 281.

[2] The transcript does not identify what this acronym represents.

[3] Mild hypertension is present where systolic readings range from 140 to 159, and diastolic readings range from 90 to 99. The Merck Manual of Diagnosis and Therapy 1633 (17th ed.

2

On January 25, 2005, Tillackdharry returned to Jacobi complaining of shortness of breath on exertion, sore throat, vomiting, and headache. Tr. at 132. The examining physician increased the dosage of Tillackdharry's hypertension medication and ordered a cardiac stress test, known as a thallium stress test, to rule out coronary heart disease. Tr. at 133.

On February 22, 2002, Tillackdharry's blood pressure measured 174/106 for the right arm, and 166/106 for the left arm. Tr. at 135. He told the examining physician that he had not taken HCTZ, a medication for hypertension, on a regular basis. Id. The physician instructed him to resume taking HCTZ, increased the dosage of another hypertension medication, and scheduled the previously ordered thallium stress test for April. Tr. at 135-36.

About three weeks later, the examining physician noted that Tillackdharry's hypertension was "well-controlled." Tr. at 138. His blood pressure was down to 118/84 for the right arm, and 116/84 for the left arm. Id.

Finally, on April 17, 2002, Tillackdharry underwent a thallium stress test and a myocardial perfusion test, to measure the flow of blood through the heart. Tr. at 141-42; Dorland's at 1169, 1350. The test results revealed no abnormalities and Tillackdharry's physical working capacity was assessed to be "fair for a man of his age."[4] Tr. at 141-43.

### 2. **Psychiatric Health**

Tillackdharry underwent his first examination at Bronx-Lebanon Hospital Center's Department of Psychiatry ("Bronx-Lebanon") on December 3, 2001. Tr. at 99-111. He reported that he had been hospitalized for suicidal thoughts five to six years earlier, but denied current thoughts of suicide. Tr. at 100-01. He also reported a history of alcohol abuse since he was nineteen years old, but indicated that drugs or alcohol had only a mild impact on his present life. Tr. at 101. Dr. Yevgenia Aronova observed that Tillackdharry's mood was depressed, but that his thoughts were normal, memory unimpaired, and concentration, insight, judgment, and impulse control were "fair." Tr. at 106-07. He diagnosed depressive disorder "NOS" (not otherwise specified), hypertension, back pain, unemployment and lack of family support, and a Global Assessment of Functioning ("GAF") of 60.[5] Tr. at 107.

---

1999).

[4] Tillackdharry would have been about fifty-one years old at this time.

[5] A GAF of 51 to 60 indicates moderate symptoms such as flat affect and circumstantial speech, and occasional panic attacks, or moderate difficulty in social, occupational, or school

About three weeks later, Dr. Aronova again examined Tillackdharry who still felt depressed. Tr. at 211. Dr Aronova noted that Tillackdharry's mood appeared depressed, but that his speech was regular and thought processes normal. Id.

On January 28, 2002, Tillackdharry complained of an inability to think clearly because he had suffered headaches daily for the previous two weeks. Tr. at 212. Based on his opinion that the prescribed medication Zoloft had caused the headaches, Dr. Aronova switched him to Wellbutrin. Tr. at 213. He observed that Tillackdharry's mood was mildly depressed, but that his speech and thought processes were normal. Id.

On February 28, 2002, Tillackdharry reported that he felt better on Wellbutrin than on Zoloft, but that he was constantly tired and unable to participate in a welfare mandated work training program. Tr. at 215, 338. He admitted drinking three to four beers on occasion. Tr. at 215. Dr Aronova noted that Tillackdharry was cooperative, but that his depression was not yet stabilized and that he should continue to take Wellbutrin. Tr. at 215-16.

On March 29, 2002, Tillackdharry complained of insomnia and low energy. Tr. at 216. Dr. Aronova assessed mild depression and instructed Tillackdharry to continue taking Wellbutrin. Tr. at 217.

**C.     Evidence at Administrative Hearing**

After traversing several rungs on the Social Security Administration ladder, Tillackdharry finally reached the administrative hearing stage about two years after he first applied for DIB. Two medical experts and a vocational expert testified at the hearing held before an Administrative Law Judge ("ALJ") on March 9, 2005. Tr. at 12. Dr. Charles A. Plotz, M.D.,[6] an internist and arthritis specialist, testified that, based on his review of the clinical physical evidence during the period relevant to Tillackdharry's DIB claim, Tillackdharry would have had no limitations on sitting and could easily stand and walk six hours in the course of an eight-hour workday. Tr. at 12, 317-18. He added that because of hypertension, Tillackdharry should not lift and carry more than twenty pounds. Tr. at 318.

---

functioning. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). A GAF of 61 to 70 indicates mild symptoms such as depressed mood or insomnia, or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." Id.

[6] The hearing transcript erroneously refers to Dr. Plotz as Dr. Clark. Tr. at 317-19.

Dr. Michael Friedman, Ph.D.,[7] a clinical psychologist, reviewed the records from Bronx-Lebanon and testified that, during the relevant period, Tillackdharry suffered from "a depressive disorder not otherwise specified." Tr. at 12, 321-22. He gave his opinion that Tillackdharry had mild limitations as to his ability to perform activities of daily living, to socialize, and to sustain concentration, persistence, and pace, but that these limitations did not prevent him from doing simple, routine, low stress work. Id. On cross-examination by Tillackdharry's attorney, Dr. Friedman testified that Tillackdharry's statement in the Bronx-Lebanon record of February 28, 2002, that he felt unable to participate in a work training program, was not supported by Dr. Aronova's mental status findings. Tr. at 339-42.

Mark Ramnauth,[8] a vocational expert, identified several jobs that a person of Tillackdharry's age, education, and prior work experience could perform given the physical and mental limitations indicated by Drs. Plotz and Friedman. Tr. at 12, 345-46. He testified that these jobs—which included those of marker, ticket taker, light duty cleaning, and assembly work—were available in the local and national economy. Id.

**D.      Types of Benefits & Procedural Posture**

Under the Social Security Act, two types of benefits are available to individuals with disabilities: Title II of the Act authorizes DIB, and Title XVI authorizes supplementary security income ("SSI"). See Barnhart v. Walton, 535 U.S. 212, 214 (2002). To be eligible for DIB, a claimant must be "insured for disability insurance benefits," and establish that he became disabled on or before the expiration of his insured status. 42 U.S.C. § 423(a)(1)(A), 423(c)(1) (Supp. 2005); see, e.g., Arnone v. Bowen, 882 F.2d 34, 38 (2d Cir. 1989). A claimant's "insured status" is calculated using a system of "quarters of coverage" ("QC"), with each quarter defined as three calendar months. 42 U.S.C. 423(c)(1)(B) (Supp. 2005); see 20 C.F.R. § 404.102 (2005). The claimant is credited with QCs based on wages earned or self-employment income derived during the calendar years the claimant has worked. See 20 C.F.R. § 404.140 (2005). Tillackdharry, who claims to have become disabled after age thirty-one, would be "covered" or insured in a particular quarter only if he had accumulated at least twenty QCs during the forty quarter period ending with that particular quarter. See 20 C.F.R.

---

[7] The hearing transcript misspells Dr. Friedman's name as "Freedman." Tr. at 320.

[8] The hearing transcript misspells Mr. Ramnauth's name as "Raman." Tr. at 344.

§ 404.130(b) (2005). Eligibility for SSI, on the other hand, is determined by financial need, and a claimant's income may not exceed specified dollar amounts. See 42 U.S.C. § 1382(a) (Supp. 2005).

Tillackdharry first applied for both DIB and SSI on May 22, 2003, based on psychiatric problems, hypertension, back pain, and diabetes. Tr. at 12. He alleged an onset date of January 31, 2001, for his DIB claim. Id. On initial administrative review, Tillackdharry's SSI claim was allowed, but his DIB claim was denied for failure to prove statutory "disability" before his insured status expired on March 31, 2002. Id.; Tr. at 26.

On March 9, 2005, Tillackdharry appeared before an ALJ to appeal the DIB ruling. Id. Tillackdharry, who was represented by an attorney, admitted that he had not received treatment for a physical condition prior to October 2001, or for a mental condition prior to December 2001. Tr. at 300. He moved to amend the onset date for his DIB claim to December 3, 2001, the date he began treatment with Dr. Aronova. Id.

On April 6, 2005, the ALJ ruled that Tillackdharry was not entitled to DIB because he was not "disabled" between his amended alleged onset date of December 3, 2001, and March 31, 2002, the date he was last insured (the "DIB Period"). Tr. at 13, 18. The ALJ's decision became the final decision of the Commissioner on May 20, 2005, when the Appeals Council denied Tillackdharry's request for review. Tr. at 5. This action followed.

## II. DISCUSSION

### A. Standard of Review

This Court reviews the record to "determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). It is not the court's role to determine whether it would have reached a different result if it reviewed the case de novo. See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The substantial evidence standard applies to the ALJ's findings of fact, inferences, and conclusions. See Flors v. Massanari, No. 00 Civ. 5767, 2002 WL 100631, at *3 (S.D.N.Y. Jan 25, 2002).

### B. Plaintiff's Burden of Proof

A plaintiff who seeks DIB or SSI benefits must prove that he suffers from a disability

6

by showing that "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) (Supp. 2005); see Barnhart, 535 U.S. at 214 (stating that the Social Security Act applies the same definition of "disability" to both DIB and SSI benefits). The inability to engage in gainful activity, not just the debilitating medical condition, must continue for a period of at least twelve months. See Barnhart, 535 U.S. at 217-22.

C.     **ALJ's Decision Was Supported by Substantial Evidence**

The ALJ evaluated Tillackdharry's DIB claim pursuant to the five-step procedure set forth in 20 C.F.R. Section 416.920(a). In accordance with this procedure, the ALJ found that Tillackdharry: (i) did not engage in any substantial gainful activity during the DIB Period; (ii) had depressive disorder "NOS", controlled hypertension, and history of alcoholism; (iii) had no impairments that met or equaled the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (iv) during the DIB Period, had the residual functional capacity to sit without restriction, stand and/or walk for six out of eight hours in a work day, lift or carry up to twenty pounds, and perform simple, routine, and low stress tasks, but was unable to perform any of his past relevant work; and (v) during the DIB Period, taking into account his age, education, and work experience, had the residual functional capacity to perform a significant range of light work[9] available in the national economy. Tr. at 16-17.

The ALJ subpoenaed copies of Tillackdharry's pertinent medical and mental health treatment records before the hearing, and his findings are supported by substantial evidence. Tr. at 12, 113, 181. The ALJ's finding as to Tillackdharry's depression, hypertension, and history of alcoholism is amply supported by the Jacobi and Bronx-Lebanon records: Dr. Aronova diagnosed Tillackdharry as suffering from depressive disorder "NOS;" the Jacobi records demonstrate that Tillackdharry's hypertension responded to and was controlled by medication; and the Bronx-Lebanon records document Tillackdharry's own report of alcohol

---

[9] Light work involves frequent lifting of no more than twenty pounds at a time, or carrying objects up to ten pounds. A job falls in this category when, regardless of the weight lifted, it requires a good deal of walking or standing, or involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 416.967(b) (2005). Light work also encompasses sedentary work. Id.

7

abuse from age nineteen. The ALJ's conclusions as to Tillackdharry's residual functional capacity are founded in the expert testimony of Drs. Plotz and Friedman. Moreover, nothing in the medical experts' testimony is contradicted by the treatment records. Finally, the ALJ's finding that Tillackdharry was able to perform a significant range of light work accords with the vocational expert's hearing testimony. Consequently, the ALJ's conclusion that Tillackdharry was not "disabled" during the DIB Period was more than adequately supported by the relevant evidence.

### III. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings, to affirm the Commissioner's decision, is granted. Tillackdharry's cross-motion for judgment on the pleadings, to remand the case to the Commissioner, is denied. The Clerk of the Court is instructed to close this motion and remove this case from my docket.

**IT IS SO ORDERED.**
**New York, New York**
**April 11, 2006**

U.S.D.J.